# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MARLIS O'LEARY,                    )
                                   )
                 Plaintiff,        )
                                   )
        vs.                        )         08 C 7246
                                   )
PAUL KAUPAS, et al.,               )
                                   )
                 Defendants.       )

## <u>MEMORANDUM OPINION</u>

CHARLES P. KOCORAS, District Judge:

This case comes before the Court on two motions. Plaintiff Marlis O'Leary ("Plaintiff") moves for partial summary judgment against Defendant Paul Kaupas (the "Sheriff" or "Sheriff Kaupas") pursuant to Federal Rule of Civil Procedure 56. Defendants Sheriff Kaupas, Will County Sheriff ("Sheriff's Office"), Lieutenant Marty Shifflet ("Lt. Shifflet"), Sergeant Zaragoza ("Sgt. Zaragoza"), Sergeant Chester ("Sgt. Chester"), Gabriel Alvarado ("Alvarado"), Ron Adams ("Adams"), Chris Wilhelmi ("Wilhelmi"), and Michael Harkins ("Harkins") (collectively, the "Defendants") move for summary judgment against Plaintiff. For the reasons stated below, Plaintiff's motion for partial summary judgment is denied. Defendants' motions for summary judgment are granted in part and denied in part.[1]

---

[1] Defendants also move to strike parts of Plaintiff's amended responses to Defendants' statement of material facts and Sheriff Kaupas moves to strike parts of Plaintiff's amended responses

# BACKGROUND

This dispute arises out of allegations of sexual harassment and retaliation that Plaintiff suffered while employed as a correctional officer at the Will County Adult Detention Facility (the "ADF").

## Parties

Plaintiff was employed at the ADF from March 18, 2006, to June 27, 2007. Defendant Sheriff's Office is a department of Will County, a municipality incorporated under the laws of the State of Illinois. Sheriff Kaupas has been the Sheriff of Will County since December 2002. Lt. Shifflet and Sgt. Luna were Plaintiff's supervisors. Officers Harkins, Adams, Wilhelmi, and Alvarado were correctional officers holding the same rank as Plaintiff. Plaintiff's fellow officers were not her supervisors and did not have the power to terminate or suspend her employment, organize her assignments, discipline her, or grant her vacation, compensatory or sick time. Officers Harkins, Adams, Wilhelmi, and Alvarado were also members of the Emergency Response Team (the "ERT"), a specialized unit that responded to emergency inmate disturbances at the ADF. ERT members are correctional officers who report to sergeants and do not receive or give orders to other correctional officers even in emergency situations.

---

to Sheriff Kaupas' statement of additional facts. In the present ruling, the Court only considered and discussed facts supported by admissible evidence.

**Sexual Harassment**

Plaintiff alleges that from March 2006 to some time around May 2007 she was sexually harassed by Sgt. Luna and officers Harkins, Wilhelmi, Adams, Alvarado, and Lt. Shifflet. The Court describes below the facts relevant to each individual defendant.

**Sergeant Luna**

From March 2006 to August 2006 Sgt. Luna invited Plaintiff out on dates approximately fifteen times, invited her to his birthday party, made a bet with Harkins over who would be the first one to sleep with her, and yelled at her about the way she was wearing her bulletproof vest. On one occasion, Sgt. Luna aimed a Taser gun at Plaintiff and other officers, said "whose day is it to get Tasered?" and discharged the gun close to Plaintiff. On another occasion, while Sgt. Rose Albano ("Sgt. Albano") and other employees were walking by the scene, Sgt. Luna placed a baton between his genitals and, while simulating a sexual act, made phallic rocking gestures before touching Plaintiff's upper thigh (the "baton incident"). Sgt. Albano testified that she did not witness the baton incident.

After the summer of 2006, Sgt. Luna stopped bothering Plaintiff and, on November 24, 2006, he prepared her annual performance and gave her a fair review.

**Officer Harkins**

Harkins made sexually promiscuous comments and suggestions. Among other things, Harkins incessantly requested sexual favors from her, boasted about the size of his penis and about how good he was in bed, made hand gestures insinuating that he was going to have sex with her later, requested that she show him her breasts, told her that the only thing women are good for is to have sex with them before abandoning them, told her that the only way she could become sergeant was to make herself "available" or become a member of the "carpet muncher team," and referred to female Officer Tonya Grabavoy ("Grabavoy" or "Wolfe") as "grab-a-ho."

Despite Harkins' initial unwelcome conduct, around May 2006, Plaintiff forgave his sexual advances, stopped viewing his comments as sexually harassing, and became friends with him. Plaintiff went to bars and restaurants with Harkins, invited him to her house to talk and watch TV in the presence of her son, and hugged him goodbye. They drove to work together and sat in his or her car in the ADF parking lot to chat. Plaintiff referred to him as "puppy," sent him texts saying "meow," and sent him a picture of herself at the beach. Plaintiff thought Harkins was a friend who was helping her learn the job and was on her side. When Plaintiff learned that Harkins was married, she was irritated because he flirted with her and other women. Plaintiff and Harkins also talked about the latter's lack of sex in his marriage.

Furthermore, Harkins testified that Plaintiff wrote and gave him two cards. The first one was addressed to him as "my puppy" and was signed "love, your kitty." In the card, Plaintiff wrote that she viewed him as "a loving person that needs the same love back," and that he had "become something [she] never imagined." The second card was signed "meow" and stated "I can't get you out of my mind" and "I've memorized your face and the way you look at me . . . it melts my heart every time I think about it." Although Plaintiff admits that she wrote these cards, she denies she gave them to Harkins. Plaintiff maintains that she could not remember the name of the person to whom she gave the cards.

Between February and August 2007, Plaintiff made sixty calls to Harkins and was unable to explain why she called him over a month after she had stopped working at the ADF.

**Officer Wilhelmi**

Officer Wilhelmi made sexually promiscuous comments by asking her whether she was wearing a new bra, and by telling her that he liked her "tits" and that he wanted to see her wearing only a bulletproof vest. On one occasion, Wilhelmi went to her house unannounced. After Plaintiff allowed him in and the two talked about work, Wilhelmi put his hand on her leg and ran it up her thigh, in the presence of her son.

Defendants argue that despite Wilhelmi's conduct, Plaintiff remained friends and continued to socially interact with him. For instance, on his birthday, Plaintiff went out with him and two other officers and gave him a birthday card signed "love, Marlis." After the two officers left the party, Plaintiff accompanied Wilhelmi to a restaurant because he was drunk and she was concerned about him.

Plaintiff further alleges that some time after going out with Wilhelmi for his birthday, he met her at a copy room at the ADF, told her that he hadn't touched a woman in a long time, and attempted to kiss her.

**Officer Adams**

In February or March 2007, Adams made sexually promiscuous comments by telling her he had an open marriage, by commenting about her breasts and body, and by asking her if she liked to have sex or perform oral sex. Despite the sexual comments, Plaintiff asked Adams to help her talk to Lt. Shifflet about getting transferred to Adams' transportation unit and asked him to accompany her to review her personnel file. Between February 20, 2007 and July 11, 2007, Plaintiff made forty-nine telephone calls to Adams, one of which was made on July 11, 2007, two weeks after Plaintiff had stopped working at the ADF. Plaintiff did not provide an explanation for that phone call.

**Officer Alvarado**

Alvarado repeatedly requested sexual favors and asked her whether she spat or swallowed. On one occasion, Officer Alvarado called her while she was in her pod and

told her that Harkins was talking about how good she was in bed and that he wanted to have a threesome with her and Harkins. Additionally, Alvarado advised her to "throw caution to the wind," forget about what people think, do that stuff before she got married, and have sex with as many people as possible. Alvarado asked her to admit she had sex with Harkins, and told her that women were "birthing chambers." Plaintiff expressed her displeasure at Alvarado's remarks and asked him to stop bothering her. On another occasion, Alvarado put his hand on her leg and tried to give her a massage.

During her employment at the ADF, Plaintiff was assigned to work with Alvarado on only two occasions, November 17, 2006, and December 11, 2006.

**Officer Tomalieh**

During the summer of 2006, Tomalieh repeatedly asked for sexual favors, asked about her favorite sexual positions and sexual preferences, grabbed her shoulders and attempted to give her a massage, told her she had nice "tits," and told her about how he would like other employees at the jail to give him blowjobs. Tomalieah and other officers would also make gestures insinuating that Plaintiff was having sex or that she was "fuckable." Tomalieh finally told her that he could get another ERT member to vote for her to become an ERT officer if they became "closer friends."

Despite Tomalieh's attitude, Plaintiff became friends with him and, in several instances, invited him to her place late at night. On one occasion, when Tomalieh went to her home unannounced, Plaintiff helped him cover a hickey on his neck because she

knew he was married. On another occasion, during a karaoke bar event, Tomalieh put his hand on her leg and tried to rub her shoulders. After that last incident, Plaintiff stopped talking to him. Tomalieh retaliated by calling her "whore," "cunt," and "bitch."

**Officers Perillo and Grozik**

In March 2006, Officer Vince Perillo ("Perillo") repeatedly told her that she smelled nice and sniffed her. Officer Mike Grozik whispered that he needed a "personal haircut."

**Nicknames**

Plaintiff asserts that she was generally known at work by the nicknames of "swamp donkey" or "swamp bucket," which carry a sexual connotation. Although no coworker ever called Plaintiff "swamp donkey" to her face, she heard Officer Fehreen Jesani ("Jesani") call her "swamp bucket." Lt. Shifflet testified that, on one occasion, he heard two different officers call Plaintiff "swamp donkey." Sgt. Chester and Perillo also heard Plaintiff being referred to as "swamp donkey" once or twice. Sgt. Alexander heard some employees say that other people have called Plaintiff "swamp donkey" but never personally heard any employee refer to her by that name. Plaintiff was unaware of the nicknames' meaning until another coworker explained it to her. Officers Carey and Grabavoy, who worked the same shift as Plaintiff, and Caceres, never heard any officer use any nickname in reference to Plaintiff.

**Pornography**

Plaintiff alleges that during her assignments at the booking area in the summer of 2006, Lt. Shifflet allowed other correctional officers to play sexual games and watch pornography on their work computers. The screen savers of their computers also carried pictures of naked women. On one occasion, Plaintiff allegedly saw Alvarado playing the game of "whack-a-ball" which consisted of whacking images of testicles back and forth. Lt. Shifflet walked by the officers at least ten times while they were viewing pornography and playing pornographic games without reprimanding them. Instead, Lt. Shifflet sat with them and played whack-a-ball.

According to Defendants, Plaintiff exaggerates her exposure to pornography because Lt. Shifflet could not have condoned the officers' conduct more than two times. In addition, Lt. Shifflet denies that he ever played whack-a-ball or witnessed officers watch pornography or play sexual games at the ADF. Carey also testified that he never saw any coworkers view pornography or play whack-a-ball at the workplace.

**Retaliation**

Plaintiff maintains that following her complaints to several supervisors about the ongoing sexual harassment, Lt. Shifflet and Sgt. Zaragoza retaliated against her.

According to Plaintiff, Lt. Shifflet started retaliating against her on October 31, 2006 by continuously assigning her to D-Pod which housed all the disciplined maximum security inmates and the Medical Unit ("Medical"), which housed mentally and

physically unstable inmates. Plaintiff considered D-Pod and Medical undesirable assignments because disciplined officers were assigned to those posts and other officers and sergeants asked her what she had done to be assigned there so much. Lt. Shifflet referred to these assignments as "Siberia" and told her that he would put her "in Siberia until she calms down and stays under the radar."

Defendants dispute that Plaintiff was assigned to D-Pod and Medical for disciplinary reasons as there are no disciplinary assignments at the ADF. According to Defendants, Plaintiff was assigned to D-Pod and Medical because these areas are busier and more demanding than other areas. Defendants also argue that between October 31, 2006 and June 27, 2007, Plaintiff worked a total of 136 shifts and was assigned to D-Pod only 10 times and to Medical only 27 times. In addition, out of the 76 shifts in which Lt. Shifflet was the watch commander, Plaintiff was assigned to D-Pod or Medical only 20 times.

On January 23, 2007 Lt. Shifflet placed Plaintiff on proof of illness status which required her for the next six months to provide a doctor's note each time she took sick leave. Lt. Shifflet claims he placed Plaintiff on proof of illness status because she took sick days on January 14, January 18, and January 23, 2007, and all sick days were taken before or after previously scheduled days off, which suggested a pattern of abuse. About a month after putting her on proof of illness status, Lt. Shifflet told Plaintiff that as long

as she had a doctor's note indicating that she was under his or her care, she did not need to justify her absence every time.

On March 10, 2007 Lt. Shifflet ordered Plaintiff to request permission from the housing and booking Sergeants before leaving her post, even for lunch breaks and trips to the restroom. Lt. Shifflet gave this order because he noticed Plaintiff frequently abandoned her post and other officers complained about her absence. In July 2007, Lt. Shifflet was transferred to a new position away from the ADF. Six weeks before his departure, he informed Plaintiff that she no longer needed permission to leave her post.

Plaintiff contests Lt. Shifflet's stated reasons for putting her on proof of illness notice or ordering her to obtain permission to leave her post. According to Plaintiff, she was subjected to retaliation because she had complained about sexual harassment. Plaintiff also claims she was treated differently than other officers because she was the only one Lt. Shifflet ordered to ask permission before leaving her pod. She felt humiliated when other officers asked her what she had done to deserve this treatment and made mocking jokes about her having to ask permission to "have a potty break."

**The Inmate Incident**

On June 20, 2007 a fight broke out between two inmates and Plaintiff attempted to separate them. The procedure regarding inmate disturbances required Plaintiff to immediately call Central Control which would then dispatch the ERT unit to the location

of the disturbance. According to Sgt. Zaragoza, instead of calling Central Control, Plaintiff notified the Watch Commander and the Housing Sergeant, opened the cell door, and handled the altercation herself. When Sgt. Zaragoza learned about the incident, she reminded Plaintiff of the policy regarding inmate fights and asked her to document the incident in a report. Plaintiff prepared a report but Sgt. Zaragoza considered it untruthful as Plaintiff made no reference to a fight and failed to explain why she had a nurse examine the inmates. Sgt. Zaragoza was also skeptical about the report because she doubted that a correctional officer would open a cell door upon an inmate's request. Sgt. Zaragoza told Plaintiff to rewrite the report truthfully and include all pertinent information. Plaintiff submitted a second report which failed to mention that a fight had occurred and that inmates had suffered injuries. The information contained in the second report was inconsistent with the information Sgt. Zaragoza had collected from the inmates and the nurse who treated them. Sgt. Zaragoza believed that Plaintiff intentionally falsified the report to avoid discipline for her failure to comply with the procedure. On June 27 2007, Sgt. Zaragoza prepared a memorandum initiating an investigation that could potentially lead to disciplinary action. The memorandum was never delivered to Plaintiff because on June 27, 2007 Plaintiff took unpaid medical leave and never returned back to work.

Plaintiff denies that the June 20, 2007 incident involved an inmate fight or that she was untruthful in her report and states that she would never have opened the cell had a fight between inmates occurred. In her eyes, the June 20, 2007 incident and the investigation that ensued constituted another retaliatory act.

**Anti-harassment Policy**

Throughout Plaintiff's employment, the Sheriff's Office had a written policy prohibiting sexual harassment and retaliation in the workplace and providing procedures for responding to internal complaints about sexual harassment and retaliation.

**Complaints about the Sexual Harassment**

Plaintiff maintains that she orally complained about the harassment and retaliation to multiple supervisors who took no action to investigate her allegations.

Plaintiff allegedly complained to Lt. Gardner ("Lt. Gardner") about Alvarado's sexual comments. Lt. Gardner responded that he could not help her because he was just a "roving lieutenant" and could not "make waves." The record does not reflect the exact date Plaintiff complained to Lt. Gardner.

In November 2006, Plaintiff complained to Sgts. Alexander and Albano about being sexually harassed at work. Sgt. Albano told her that when she first started at the ADF she was also called names and people thought she was "sleeping around." Sgt. Albano merely advised her to "cross her T's and dot her I's."

In November 2006, Plaintiff complained to Lt. Shifflet about a dispute she had with female coworker Jesani about some sexual rumors Jesani was allegedly spreading about Plaintiff sleeping with other officers. Apart from the rumors, Plaintiff did not complain about sexual harassment to Lt. Shifflet. In November 2006 Lt. Shifflet held a meeting with Plaintiff and Jesani in an attempt to resolve the dispute.

Plaintiff also alleges that sometime after March 2007 Plaintiff turned to Chief Deputy O'Leary (the "Chief Deputy") to complain about the sexual harassment, the nicknames, and about Lt. Shifflet's order to request permission to leave her pod but the Chief Deputy responded that he did not want to know any names.

Between March and June 2007 Plaintiff complained to Caceres about sexual harassment at work. Plaintiff testified that Caceres witnessed some of the sexual harassment and retaliatory acts Plaintiff experienced and helped her draft a complaint to a supervisor. Around the same time, Plaintiff complained to Sgt. Roy Martin ("Sgt. Martin") about Lt. Shifflet retaliating against her by requiring her to obtain authorization before leaving her assignment. Sgt. Martin responded that, in his opinion, she was not the victim of discrimination because all officers have to remain at their assigned posts.

Furthermore, Plaintiff alleges that during the week of March 11, 2007, which was a vacation week for her, she went to the courthouse accompanied by Adams to review

her file. At the courthouse, Plaintiff went to Sheriff Kaupas' office and complained to him about the sexual harassment and the retaliation she was enduring at work. Plaintiff maintains that she specifically complained about Lt. Shifflet sexually harassing and retaliating against her, and "gunning" for her job. According to Plaintiff, Sheriff Kaupas responded "that's just Marty being Marty" or "that's just the way Marty is" and ended the meeting without further investigation.

Defendants dispute Plaintiff's allegations that she complained to her supervisors. Defendants assert that no supervisor was ever made aware of the alleged sexual harassment and retaliation which explains why no action or investigation was taken. The Chief Deputy testified that Plaintiff never informed him about any sexual harassment. Lt. Gardner also denies that Plaintiff complained to him about sexual harassment or nicknames, and denies saying to Plaintiff that he could not help her because he was a "roving lieutenant." Along the same lines, Sergeants Alexander, Albano and Martin deny that Plaintiff complained about sexual harassment and Caceres testified that he never witnessed sexual harassment or retaliation directed towards Plaintiff. Caceres does not recall the reasons why he drafted Plaintiff's complaint but indicated that he generally assisted other coworkers in writing and structuring memos to supervisors.

Defendants maintain that Plaintiff did not review her personnel file during the week of March 11, 2007, but rather did so on March 20, 2007, a day on which she was not scheduled to work. In addition, Sheriff Kaupas testified that Plaintiff never came to

his office in March 2007, did not complain about sexual harassment or retaliation at the ADF, and hence did not tell her that "that's the way Marty is." Sheriff Kaupas testified that on March 20, 2007 he was not in his office because he had appointments with his dentist and doctor. Defendants also point to the fact that Plaintiff maintained a personal daily calendar where she documented the important facts about the alleged harassment and that the calendar has no entries displaying a meeting between her and the Sheriff during the week of March 11, 2007. Plaintiff retorts that the calendar does not document all relevant information.

Despite the parties' dispute over the veracity of Plaintiff's complaints to supervisors, the record reflects that some facts are undisputed. To begin, Plaintiff did not submit a written complaint to any supervisor at the Sheriff's Office during her active employment at the ADF. Further, Plaintiff never complained to Sgts. Chester and Zaragoza and never complained to any supervisor about the conduct of Sgt. Luna and Officers Harkins, Tomalieh, Perillo, and Grozik.[2] Plaintiff cannot recall whether she

---

[2] With respect to Sgt. Luna's conduct, it undisputed that Plaintiff never complained about his unwelcome behavior to anyone. During her deposition, Plaintiff testified that she complained to Sgt. Albano about the baton incident on the same day it occurred. However, Plaintiff later changed her testimony and ultimately concluded that she was unsure whether she ever complained to Sgt. Albano about the baton incident. In any event, Sgt. Albano denies witnessing or speaking with Plaintiff about the alleged baton incident. Defendants also point to the fact that, in September 2006, Jesani made a formal complaint of sexual harassment to Lt. Shifflet about Sgt. Luna and asked Plaintiff to join her complaint. Plaintiff refused out of fear of losing her job. Defendants maintain that even though Jesani was not fired after lodging her complaint, Plaintiff chose not to join Jesani's complaint or file her own.

complained about Adams' comments.[3] Plaintiff finally admits that she never complained to her supervisors about the whack-a-ball game.

**Internal Affairs Investigation**

On July 13, 2007 Plaintiff filed a charge of sexual harassment and retaliation with the Equal Employment Opportunity Commission ("EEOC"). The Sheriff's Office received the charge on July 20, 2007.

On September 28, 2007 Plaintiff submitted an affidavit in connection with a sexual harassment lawsuit brought against the Sheriff's Office by female correctional officer Cheryl Beverly (the "Beverly case"). *See Beverly v. Kaupas*, No. 05 C 6338 (N.D. Ill. Sept. 28, 2007).

The Sheriff's Office claims that it first became aware of Plaintiff's precise allegations of sexual harassment and retaliation in October 2007, when it received a copy of Plaintiff's affidavit in connection with the Beverly case. Plaintiff disputes Defendants' assertion because she had complained to her supervisors and the Sheriff.

In response to Plaintiff's affidavit, the Sheriff ordered Sgt. Steve McGrath ("Sgt. McGrath") to conduct an investigation into the allegations some time around

---

[3] With respect to Wilhelmi's behavior, Plaintiff initially admitted during her deposition that she had not complained to supervisors about his comments about her bra or vest, about touching her leg, or trying to kiss her in the copy room. The only complaint she made about Wilhelmi was to Harkins and Adams. Subsequently, Plaintiff changed her testimony and testified that she had complained about Wilhelmi's acts to Lt. Gardner and Sgts. Alexander, Baker, and possibly Albano. It is unclear from Plaintiff's deposition whether she changed her testimony intentionally after a break or whether she misunderstood the questions asked.

October or November 2007. Sgt. McGrath interviewed Plaintiff, Sheriff Kaupas, Chief Deputy Van Dyke, Lt. Shifflet and Officer April Arambasich. On December 7, 2007, Sgt. McGrath suspended the investigation because the evidence was insufficient to support Plaintiff's allegations.

On December 2, 2008 Sheriff Kaupas ordered Sgt. McGrath to resume the investigation. Sgt. McGrath sent questionnaires to 39 individuals and, in February 2009, interviewed 23 more individuals. Thus far, no disciplinary actions were taken against any of the alleged harassers.

**Federal Lawsuit**

On December 18, 2008 Plaintiff filed the instant lawsuit against Sheriff Kaupas and the Defendants. Plaintiff brought claims (1) for sexual harassment (Count I) and retaliation (Count II) under Title VII of the Civil Rights Act of 1964 ("Title VII"), (2) under *Monell v. Dep't of Soc. Servs.*, 435 U.S. 658 (1978) (the "Monell claim") and for violation of her equal protection rights under 42 U.S.C. § 1983 (Count III), and (3) intentional infliction of emotional distress under Illinois law (Count IV). Plaintiff now moves for partial summary judgment against Sheriff Kaupas. Plaintiff asks the Court to hold the Sheriff strictly liable for the conduct of his supervisors, hold him liable for the negligent response to her complaints of sexual harassment and retaliation, and preclude him from asserting an *Ellerth-Faragher* affirmative defense. Defendants move for summary judgment on all claims.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the pleadings, discovery materials, disclosures, and affidavits demonstrate no genuine issue of material fact. Fed. R. Civ. P. 56(a); *Protective Life Ins. Co. v. Hansen*, 632 F.3d 388, 391-92 (7th Cir. 2011). A genuine issue of material fact exists when, based on the evidence, a reasonable jury could find in favor of the non-moving party. *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 297 (7th Cir. 2010). A court construes all facts and draws all reasonable inferences in favor of the non-moving party. *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). With these principles in mind, we turn to the instant motions.

**DISCUSSION**

**I.     Defendants' Motions for Summary Judgment**

**A.     Title VII: Hostile Work Environment based on Sexual Harassment**

To prevail on her Title VII sexual harassment claim, Plaintiff must show that: (1) she was subjected to unwelcome sexual conduct, advances, and requests; (2) the unwelcome conduct was directed at her because of her sex; (3) the acts were severe or pervasive enough to create a hostile work environment; and (4) there is a basis for employer liability. *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 684 (7th Cir. 2010). Defendants argue that they are entitled to summary judgment on Plaintiff's sexual

harassment claim because Plaintiff cannot prove the third prong of her claim - that the harassment was sufficiently severe or pervasive to create a hostile work environment.

A hostile work environment based on sexual harassment is actionable only if it is so severe or pervasive as to alter the terms of the Plaintiff's employment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998). The hostile work environment must be subjectively and objectively offensive, that is, "[an environment] that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id*. at 787.

### 1.    Objectively Offensive Conduct

To determine whether an environment is objectively hostile, a court must examine the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; and whether it is physically threatening or humiliating, or a mere offensive utterance." *Jackson v. Racine*, 474 F.3d 493, 499 (7th Cir. 2007). A court cannot "carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1045 (7th Cir. 2000). The Seventh Circuit has determined that:

> "[o]n one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; [and] pornographic pictures. On the other side lies the occasional

vulgar banter, tinged with sexual innuendo, of coarse or boorish workers[.]"

*Patton v. Keystone RV Co.*, 455 F.3d 812, 816 (7th Cir. 2006) (citing *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995)). "[C]onduct that is not particularly severe but that is an incessant part of the workplace environment may, in the end, be pervasive enough and corrosive enough [to meet] the standard for liability." *Jackson*, 474 F.3d at 499. In addition, if a plaintiff claims that he is suffering a hostile work environment based on the conduct of coworkers and supervisors, under the totality of circumstances approach, all instances of harassment by all parties are relevant to proving that his environment is sufficiently severe or pervasive." *Mason*, 233 F.3d at 1044-45.

In the present case, looking at the totality of the circumstances, there are questions of fact as to whether Plaintiff's work environment was objectively hostile. Plaintiff asserts that, from March 2006 to May 2007, multiple individuals, including supervisors such as Lt. Shifflet and Sgt. Luna, made sexually promiscuous comments and suggestions and subjected her to unwanted sexual touching. Plaintiff testified that, among other things, several officers made offensive comments such as "I like your tits," "Is that a new bra?" "I want to see you only wearing your vest" and that she was frequently called "bitch," "cunt," "whore" and was generally known as "swamp bucket" or "swamp donkey." Plaintiff further testified that officers were making bets on who was going to sleep with her first, commented on how good she was in bed, incited her to

engage in sexual conduct, made obscene gestures insinuating sex, made incessant requests for sexual favors, requested her to show her "tits," asked about her favorite sexual positions, and asked whether she enjoyed having sex or whether she spat or swallowed while performing oral sex. All these instances of verbal abuse were allegedly overlaid by exposure to pornographic material with a Lieutenant's assent. Plaintiff finally maintains that during the same period of time, she was subjected to unwanted sexual touching, such as Sgt. Luna placing a baton near his genitals and touching her thigh in a rocking motion or Officer Wilhelmi touching her leg, rubbing her shoulders, and attempting to kiss her. In response, Defendants argue that the internal affairs investigation of Plaintiff's allegations did not reveal any evidence of sexual harassment and that all the accused harassers denied harassing her.

Plaintiff's testimony has provided sufficient evidence to create a question of fact as to whether the atmosphere at the ADF was permeated with incessant unwelcome sexual advances, requests for sexual favors, or other physical or verbal conduct of a sexual nature. A reasonable jury could conclude, viewing the totality of the circumstances, that the conduct under scrutiny was pervasive and corrosive enough to meet the standard for liability. *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789 (7th Cir. 2007) (finding that at least eighteen sexist or sexual comments in less than a year's time was pervasive enough to create a hostile work environment).

### 2. Subjectively Offensive Conduct

Similarly, with respect to the "subjective hostility" prong of her hostile work environment claim, Plaintiff has presented sufficient evidence to create a genuine issue of fact. In addition to the allegations described above, Plaintiff testified that she asked some of the alleged perpetrators to stop bothering her and complained about their acts to supervisors and to the Sheriff. Plaintiff has also presented evidence that she stopped working because of the hostile work environment and that on July 13, 2007 she filed a charge with the EEOC. Plaintiff's sworn assertions, if credited by a trier of fact, would suffice to establish that she subjectively perceived her environment as hostile. *See Kampmier v. Emeritus Corp.*, 472 F.3d 930, 942 (7th Cir. 2007) (finding requests to stop and complaints to supervisors sufficient to establish that harassment was subjectively offensive).

Defendants argue that, even if Plaintiff's allegations are true, no reasonable jury could find the conduct of Harkins, Wilhlemi, Adams, and Tomalieh subjectively offensive because Plaintiff did not clearly express to them that their alleged sexual advances were unwelcome. The Court acknowledges that Plaintiff could have been friends with Wilhelmi, Adams, and Tomalieh, and that she had a special, close relationship with Harkins. Indeed, with respect to Harkins, the parties do not dispute that Plaintiff forgave his sexual advances, became friends and socially interacted with him,

invited him to her house in the presence of her son, and expressed affection and jealousy towards him. The existence of numerous instances of conduct on the part of Plaintiff both welcoming and inviting some of the conduct she now complains about raises serious questions about whether her work environment was subjectively offensive to her. Likewise, her admission of writing the two greeting cards containing expressions of love and intimacy but denying recollection the name of the addressee are strongly suggestive of fabrications on her part. This is particularly so when Harkins was the recipient of the cards and also admits to engaging in a sexual relationship with Plaintiff. Plaintiff's psychiatrist does not even believe Plaintiff's claimed failure of recollection as to the recipient of the cards. However, because credibility determinations should generally be avoided in the context of summary judgment determinations, we believe it is appropriate for a jury to make those calls. Therefore, the Court denies Defendants' motion for summary judgment on Plaintiff's sexual harassment claim.

## B. Title VII Retaliation

Defendants argue that they are entitled to summary judgment on Plaintiff's Title VII retaliation claim because Plaintiff failed to establish that the alleged acts of retaliation constituted adverse employment actions.

To prove retaliation, a plaintiff may proceed either under the direct or indirect method of proof. *Szymanski v. Cnty. of Cook*, 468 F.3d 1027, 1029 (7th Cir. 2006).

Plaintiff has not elected to proceed under the indirect method of proof because she has not established that she was performing her job according to her employer's legitimate expectations. *See Serednyj v. Beverly Healthcare, LLC*, No. 10 C 2201, 2011 WL 3800123, at *13 (7th Cir. Aug. 26, 2011). Thus, Plaintiff proceeds under the direct method of proof. The direct method requires her to show that she engaged in protected activity, that she suffered an adverse employment action, and that there is a causal link between the two. *Id*.

### 1.    Protected Activity

The protected activity at issue here consists of Plaintiff's complaints about sexual harassment to her supervisors. As discussed below, there is a genuine issue of material fact as to whether Defendant complained to her supervisors and to the Sheriff. However, for purposes of this analysis, we will assume without deciding that Plaintiff has satisfied the "protected activity" element.

### 2.    Adverse Employment Actions

Plaintiff alleges that Defendants retaliated against her by (1) requiring her to obtain a doctor's note when she took sick days; (2) assigning her to more difficult areas at the ADF; (3) placing her under formal investigation; (4) disparaging her reputation during Sgt. McGrath's internal affairs investigation; and (5) forcing her to request authorization before leaving her work area, including for trips to the restroom.

Plaintiff's claims of retaliation cannot succeed because they either do not rise to the level of a materially adverse action or have no causal connection to protected activity.

An adverse employment action is one that significantly alters the terms and conditions of the employee's work. *Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001). An adverse action is something "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993). Minor or trivial actions that make the employee unhappy are not sufficient. *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996).

Plaintiff first contends that Lt. Shifflet took an unjustified disciplinary action against her by placing her on proof of illness status. On January 23, 2007, Lt. Shifflet placed Plaintiff on proof of illness status because she took sick days off on January 14, 18, and 23, 2007, and all sick days were taken before or after previously scheduled days off, which suggested a pattern of abuse.[4] The Seventh Circuit, however, has held that requiring an employee to substantiate that his or her absences are illness-related does not result in tangible work consequences and therefore are not adverse employment actions actionable under Title VII. *Longstreet v. Ill. Dep't of Corr.*, 276 F.3d 379, 384 (7th Cir. 2002). Accordingly, placing Plaintiff on proof of illness status cannot constitute retaliation.

---

[4] Defendants claim that Plaintiff took a sick day off on January 17 as well but the record does not reflect that she took that day off.

Plaintiff next contends that from October 31, 2006 to June 27, 2007, Lt. Shifflet retaliated against her by repeatedly assigning her to D-Pod and Medical which were more difficult assignments than others. However, the undisputed evidence shows that, from October 31, 2006 to June 27, 2007, Plaintiff worked a total of 136 shifts and was assigned 37 times to either D-Pod or Medical. Out of these 37 times, Lt. Shifflet ordered the assignment on only 20 occasions. In other words, Lt. Shifflet assigned Plaintiff to D-Pod or Medical 20 times out of 137 shifts, which is approximately 15% of her shifts. It is unlikely that a reasonable correctional officer would find these sporadic assignments to be materially adverse. In addition, Plaintiff does not provide factual detail substantiating the nature of her assignments at D-Pod and Medical, the relative levels of difficulty of these assignments as compared to other assignments, and how these assignments constitute excessive workload or an alteration of her job responsibilities. Accordingly, Plaintiff's assignments at D-Pod and Medical were not adverse employment actions.

Next, Plaintiff argues that the formal investigation that ensued after the June 20, 2007 inmate incident constitutes a materially adverse action. Plaintiff, however, stopped working on June 27, 2007, so any resulting investigation could not have been materially adverse to Plaintiff. Thus, the formal investigation does not constitute an adverse employment action.

Plaintiff next alleges that, during the internal affairs investigation, Sgt. McGrath made disparaging comments to other interviewees by suggesting that her work performance was poor, eliciting negative information about her when he informed them that she was the object of disciplinary measures, and revealing her private medical information. General hostility and comments do not qualify as actionable adverse employment actions unless the hostility is severe and pervasive. *Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 466 (7th Cir. 2002). Here, during the internal affairs interview, Sgt. McGrath asked the interviewees whether it appeared that, when at work, "[Plaintiff] just kind of liked to roam around and do whatever she wanted to do" and whether she ever was a "discipline problem." Sgt. McGrath also asked the interviewees whether they had formed an opinion about what relation and behavior Plaintiff had with the inmates, whether she became too "chummy" with them or whether her conduct with them was in any way inappropriate. Finally, Sgt. McGrath asked Sgt. Chester whether he recalled having characterized Plaintiff as not being "the best Officer that had ever worked for [Sgt. Chester]." These questions and comments do not suggest a degree of harm or severity sufficient to significantly impact the terms and conditions of her employment. *See Grube v. Lau Indus.*, 257 F.3d 723, 728 (7th Cir. 2001) (finding critiques and negative performance evaluations not severe enough to be actionable).

Plaintiff finally contends that Lt. Shifflet retaliated against her by ordering her to obtain permission before leaving her assignment, even for trips to the restroom. Plaintiff argues that such a command was humiliating because other officers would mock her over the radio by asking her "can I take a potty break?" Conditions of employment designed to harass and humiliate an employee because she is a member of one of Title VII's protected classes may constitute an adverse employment action for purposes of a retaliation claim. *Hilt-Dyson*, 282 F.3d at 466. Here, Plaintiff testified that from March 10, 2007, to approximately June 2007, she was singled out as the only employee required to obtain permission to leave her post or to go to the restroom, and that the disciplinary measure became a matter of public knowledge and mockery. Accordingly, this action was severe, humiliating, and pervasive enough to constitute an adverse employment action.

### 3. Causal Link

Even though Lt. Shifflet's order constituted an adverse employment action, Plaintiff fails to establish the causal connection element of her retaliation claim.

Plaintiff claims that the timing of Lt. Shifflet's March 10, 2007 order constitutes circumstantial evidence demonstrating the requisite causal connection between her protected activity and the adverse employment action because the order took place on the heels of protected activity. "Suspicious timing alone rarely is sufficient to create a

triable issue." *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 905 (7th Cir. 2005). While "[t]here is no bright-line rule as to the amount of evidence necessary to survive summary judgment under the direct method . . . mere temporal proximity is not enough to establish a genuine issue of material fact." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004). Here, it is undisputed that Plaintiff complained to Lt. Shifflet about Jesani spreading sexual rumors at the ADF in November 2006. Lt. Shifflet ordered Plaintiff to obtain permission to leave her pod on March 10, 2007. More than three months elapsed between the time Plaintiff complained to Lt. Shifflet and the latter's act. A temporal gap of three months or more is too long to substantiate a causal link between Plaintiff's protected activity and Lt. Shifflet's adverse action. *See Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 919 (7th Cir. 2000) (finding three-month gap insufficient to support a causal connection for a retaliation claim).

Furthermore, Plaintiff has not offered any additional evidence to support the causal connection element. Although Plaintiff alleges that she complained to Chief Deputy O'Leary and the Sheriff, such complaints are immaterial because they occurred between April and June 2007, which is *after* Lt. Shifflet's March 10, 2007 order.[5] The only event that could remotely connect the alleged retaliation to Plaintiff's complaints is her complaint to Officer Caceres. Yet, Plaintiff does not specify the exact date she

---

[5] The Court also disregards Plaintiff's complaints to Lt. Gardner because she did not identify a specific date and therefore cannot establish a direct causal link.

complained to Caceres nor does she allege that Lt. Shifflet was aware of her complaints to Caceres. Plaintiff has therefore failed to substantiate the causal connection element of her retaliation claim. Based on the foregoing analysis, the Court grants Defendants' motion for summary judgment on Plaintiff's Title VII retaliation claim.

### C.     42 U.S.C. § 1983: Individual Liability

### 1.     Supervisory Liability

As a preliminary matter, the Court clarifies that Plaintiff cannot predicate her Section 1983 claim on alleged acts of retaliation. "[T]he right to be free from retaliation may be vindicated under the First Amendment or Title VII, but not the equal protection clause." *Boyd v. Ill. State Police*, 384 F.3d 888, 898 (7th Cir. 2004). This principle applies to the class of one theory because the "class of one theory of equal protection has no place in the public employment context." *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 609 (2008). Accordingly, the Court disregards any Section 1983 claim predicated on a theory of retaliation.

Defendants argue that Sheriff Kaupas, Lt. Shifflet, and Sgts. Chester and Zaragoza are entitled to summary judgment because they are not liable under a theory of supervisory liability. Unless he or she caused or participated in the alleged constitutional deprivation, an individual cannot be held liable in a Section 1983 action. *Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000). To be personally liable, "supervisors must

know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. In other words, they must act either knowingly or with deliberate, reckless indifference." *Grossmeyer v. McDonald*, 128 F.3d 481, 495 (7th Cir. 1997). "[S]upervisory liability can be established if the conduct causing the constitutional deprivation occurs at the supervisor's direction or with the supervisor's knowledge and consent." *Jones v. City of Chi.*, 856 F.2d 985, 992-93 (7th Cir. 1988).

**Sgt. Chester and Sgt. Zaragoza**

Plaintiff's claim against Sgts. Chester and Zaragoza is too attenuated for liability under Section 1983 to attach. Plaintiff does not allege that Sgts. Chester and Zaragoza personally engaged in acts of sexual harassment or that they were aware of instances of unlawful conduct of subordinates. In addition, Plaintiff admitted that she never complained about any sexual harassment to them. Accordingly, Sgts. Chester and Zaragoza did not facilitate, approve, or condone any unlawful conduct. The Court thus dismisses Sgts. Chester and Zaragoza from this claim.

**Sheriff Kaupas and Lt. Shifflet**

Plaintiff maintains that Sheriff Kaupas was personally involved in the alleged constitutional deprivations because he was aware of the incidents at issue and nevertheless turned a blind eye by dismissing her complaints. Plaintiff also maintains that Lt. Shifflet was personally involved in sexual harassment because he played whack-a-ball with Alvarado and, on at least ten occasions, condoned the fact that other

correctional officers viewed pornographic material on their work computers. Sheriff Kaupas and Lt. Shifflet dispute these allegations. Viewing the evidence in the light most favorable to the nonmovant, Plaintiff has set forth sufficient evidence creating a genuine issue of fact regarding Sheriff Kaupas' and Lt. Shifflet's involvement in the alleged unlawful conduct. Accordingly, Defendants' motion for summary judgment is denied as to the personal liability of Sheriff Kaupas and Lt. Shifflet.

### 2.     Color of Law Requirement

Defendants argue that there is no basis for individual liability under Section 1983 as to Officers Harkins, Alvarado, Wilhelmi, and Adams because they did not act under color of law. To be liable under Section 1983, an individual defendant must have acted under color of law. *Doermann v. Ill. Dep't of Children & Family Servs*., No. 09 C 2295, 2009 WL 3273367, at *1-2 (N.D. Ill. Oct. 6, 2009). To establish that a defendant acted under color of law in a sexual harassment context, a plaintiff must show that the defendant held some form of authority over the plaintiff, such as the power to control the circumstances of her employment. *Valentine v. City of Chi.*, 452 F.3d 670, 682-83 (7th Cir. 2006). Here, it is undisputed that Officers Harkins, Alvarado, Adams, and Wilhelmi held the same rank as Plaintiff because they were not her supervisors and none had the power to terminate or suspend her employment, organize her assignments, discipline her, or grant her vacation, compensatory or sick time. As such, these Officers had no control over the circumstances of Plaintiff's employment.

Plaintiff, however, responds that these four officers exercised *de facto* control over the circumstances of her employment because, as ERT members, they had the power in emergency situations to take her out of an assignment, assign her to another area of the facility, and give her orders and directions that they expected to be followed. Plaintiff's argument fails for several reasons. First, in support of her assertion that ERT officers could relieve her from a post to assign her to another, Plaintiff cites to pages that are not part of the record. Second, Sgt. Luna testified that ERT members were not allowed to give orders to correctional officers even during emergency situations. Finally, Sgt. Luna's position is corroborated by ERT member Harkins who testified as follows:

> Q. So can you give direct orders to a correctional officer in an emergency situation while you're in their pod?
> A. No.
> Q. Do you ever give orders to a correctional officer . . . when you're in their pod?
> A. I guess. It's not really an order. I mean, it's not like a supervisor telling you have to do something. . . [T]hey want [the emergency] taken care of. . . They're not going to not do what you're asking them.
> [. . .]
> Q. [. . .] [W]hat would happen if a correctional officer didn't follow one of your requests?
> [. . .]
> A. I have no idea.
> [. . .]
> Q. [. . .] Did you ever issue commands to other correctional officers during an emergency while you were in their pod as an [ERT] member?
> A. I'd ask them to do stuff; I wouldn't call it a command.
> Q. What would you call it?
> A. Asking him to do something.

Based on the evidence before the Court, it is undisputed that while ERT officers, as first responders, were afforded some form of direction in case of emergencies, they did not hold *de jure* or *de facto* authority to supervise officers of equal rank. Accordingly, there is no basis for individual liability under Section 1983 because Officers Adams, Alvarado, Harkins, and Wilhelmi did not act under color of law. Defendants' motion for summary judgment as to the Officers' individual liability is granted.

### D.    *Monell* Claim

Under Section 1983, municipality entities cannot be held vicariously liable for the acts of their employees in the absence of a custom, policy, or practice that effectively caused or condoned the alleged constitutional violations. *Phelan v. Cook Cnty.*, 463 F.3d 773, 789 (7th Cir. 2006). The policy or custom must be the "moving force" behind the alleged constitutional deprivation. *Gable v. City of Chi.*, 296 F.3d 531, 537 (7th Cir. 2002). A plaintiff must show a "direct causal link" between the municipal policy and the constitutional injury. *Arlotta v. Bradley Ctr.*, 349 F.3d 517, 522 (7th Cir. 2003).

To establish an official policy or custom, a plaintiff must show that his constitutional injury was caused by: (1) the enforcement of an express policy; (2) a widespread practice that, although not authorized by written law or express municipal

policy, is so permanent and well settled as to constitute a usage or custom with the force

of law; or (3) an allegation that the injury was caused by a person with final

policy-making authority. *Phelan*, 463 F.3d at 789. Plaintiff alleges that the Sheriff's

Office had a widespread practice of condoning sexual harassment.

Here, although Plaintiff has presented evidence that creates a question of fact as

to whether employees and supervisors of the Sheriff's Office subjected her to sexual

harassment, this evidence is insufficient to show that sexual harassment was a

widespread practice at the Sheriff's Office. To begin, Plaintiff fails to identify a

comparable case which would warrant the conclusion that there was a widespread

practice of condoning harassment based on sex. In *Beverly*, the district court found that

as soon as the plaintiff reported the conduct to the Warden at the ADF, the harassing

behavior ceased immediately, the harasser was transferred out of the ADF at plaintiff's

request, and an investigation was promptly conducted. 2008 WL 624045, at *10, 12.[6]

Although *Beverly* is not conclusive, it is a strong indicator that the Sheriff's Office was

not indifferent to unlawful conduct.

Most importantly, Plaintiff's proffered evidence fails to connect all these separate

instances of alleged sexual harassment into a cognizable, permanent and well-settled

---

[6] The Court can take judicial notice of facts in other decisions unless they are subject to a reasonable dispute. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1083 (7th Cir. 1997).

policy. In support of her *Monell* claim, Plaintiff argues that the Sheriff's Office condoned sexual harassment as a matter of policy because Lt. Baker, Sgt. Albano, and Officer Pacheco indicated they were also called "whore" and "bitch" and Officers Tichy and Shiperak testified in other judicial proceedings that female officers at the ADF did not report sexual harassment out of fear of retaliation.[7] These allegations are insufficient to create a question of fact as to whether the alleged constitutional violations were so widespread and a failure to discipline so pervasive to allow an inference of supervisory encouragement, condonation, or acquiescence. *See Phelan*, 463 F.3d at 790 (plaintiff must introduce evidence that the harassment was so pervasive that acquiescence from policymakers was apparent and amounted to a policy decision).

Rather, there is undisputed evidence showing that the Sheriff's Office had an anti-harassment policy in place which required all employees to attend annual training on the policy, and that, on several occasions, Sheriff Kaupas disciplined subordinates for inappropriate conduct. For instance, in 2004, Sheriff Kaupas forced Lt. Shifflet to resign from his rank of Deputy Chief after he was accused of using excessive force during a drug arrest. In 2005, Sheriff Kaupas reprimanded Lt. Shifflet after police were

_____

[7] Plaintiff also offers inadmissible evidence in support of her *Monell* claim. For instance, Plaintiff's allegation that Sgt. Luna requested sexual favors is inadmissible because it finds no support in the record. Plaintiff's allegation that she complained about Officer Wilhelmi's sexual harassment to Lt. Garnder and Sgts. Alexander and Albano is similarly on the verge of inadmissibility because the record reflects that Plaintiff made contradictory statements during her deposition. It is thus unclear from the record whether Plaintiff actually complained to her supervisors about Wilhelmi's behavior.

called to Lt. Shifflet's home for a domestic dispute between him and his wife. Sheriff Kaupas opened an internal affairs investigation and asked the Illinois Sate Police to conduct a separate criminal investigation to ensure an unbiased investigation. Although the investigation did not result in criminal charges against Lt. Shifflet, Sheriff Kaupas ordered him to undergo a fitness for duty test and forced him to take a six-week leave of absence for counseling.

In light of this evidence, the Court concludes that Plaintiff has not offered enough to create a triable claim against the Sheriff's Office. The Court grants Defendants' motion for summary judgment as to Plaintiff's Monell claim.

**E.      Intentional Infliction of Emotional Distress (IIED)**

Defendants argue that they are entitled to summary judgment on Plaintiff's IIED claim because the Illinois Human Rights Act (the "IHRA") preempts Plaintiff's IIED claim. The IHRA preempts tort claims that are inextricably linked to allegations of sexual harassment and requires that such claims be brought before the Illinois Human Rights Commission. 775 Ill. Comp. Stat. 5/8-111(D); *see Quantock v. Shared Mktg. Servs., Inc.*, 312 F.3d 899, 905 (7th Cir. 2002). Here, Plaintiff's IIED claim is preempted by the IHRA because the IIED claim derives directly from her sexual harassment claim. In her complaint, Plaintiff incorporated her sexual harassment allegations in support of her IIED claim and does not establish which elements of her IIED claim create an independent basis for her action. Because Plaintiff's IIED claim

is inextricably linked to her sexual harassment claim and has no independent basis separate from the IHRA, Plaintiff's tort claim is preempted. Accordingly, the Court grants Defendans' motion for summary judgment on Plaintiff's IIED claim.

## II.    Plaintiff's Motion for Summary Judgment

### A.    The *Ellerth-Faragher* Affirmative Defense

Plaintiff asks the Court to preclude Sheriff Kaupas from raising the *Ellerth-Faragher* affirmative defense because there are no genuine issues of material fact that Sheriff Kaupas is strictly liable for the sexual harassment of his supervisors. Subject to the so-called *Ellerth-Faragher* defense, employers are vicariously liable for sexual harassment by a supervisor with authority over the victimized employee. *Burlington Indus. Inc., v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher,* 524 U.S. 775. To raise the *Ellerth-Faragher* affirmative defense, the Sheriff must establish that (1) he exercised reasonable care to prevent and promptly correct any sexually harassing behavior, and (2) that Plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by her employer or to avoid harm otherwise. *Id*. If, however, the harassment culminates in a tangible employment action against the employee, the employer is strictly liable for the supervisor's acts. *Faragher*, 524 U.S. at 808.

In the present case, there are questions of fact as to whether the alleged sexual harassment culminated in a tangible employment action against Plaintiff, whether

Sheriff Kaupas failed to adequately respond to such harassment, and whether Plaintiff unreasonably failed to complain about the harassment. Indeed, Plaintiff alleges that Lt. Shifflet engaged in sexual harassment when he played whack-a-ball at work, and condoned such unlawful conduct when, on at least ten occasions, he allowed, in Plaintiff's presence, other correctional officers to carry screen savers with naked women, play sexual games, and watch pornography on their work computers. If true, Lt. Shifflet's actions would constitute tangible employment actions. *See Venezia v. Gottlieb Mem'l Hosp., Inc.*, 421 F.3d 468, 473 (7th Cir. 2005) (finding that employer's toleration of pornographic photographs could constitute adverse employment action). Plaintiff further alleges that on March 11, 2007 she complained about Lt. Shifflet's sexual harassment to Sheriff Kaupas who failed to initiate an investigation. Sheriff Kaupas and Lt. Shifflet deny Plaintiff's allegations. Accordingly, material questions of fact remain as to the applicability of the *Ellerth-Faragher* affirmative defense. Plaintiff's motion for summary judgment on the *Ellerth-Faragher* affirmative defense is denied.

### B.     Negligence Theory

Plaintiff next argues that she is entitled to summary judgment because Sheriff Kaupas was negligent in responding to her complaints of co-worker harassment. While employers are strictly liable for the sexual harassment engaged in by their supervisors, they are liable for a non-supervisory employee's sexual harassment "only when they

have been negligent either in discovering or remedying the harassment." *Parkins v. Civil Constructors of Ill.*, 163 F.3d 1027, 1032 (7th Cir. 1998) (citations omitted). An employer's legal duty is discharged if it acts reasonably to discover and rectify acts of sexual harassment by its employees. *Id*. The employer becomes liable for the co-worker's harassment if it "know[s] or should know that wrongdoing is afoot and yet fail[s] to take steps reasonably designed to stop it." *Hostetler v. Quality Dining*, *Inc*., 218 F.3d 798, 811 (7th Cir. 2000). "Notice or knowledge of the harassment is a prerequisite for liability." *Parkins,* 163 F.3d at 1035. A plaintiff "cannot withstand summary judgment without presenting evidence that she gave the employer enough information to make a reasonable employer think there was some probability that she was being sexually harassed." *Zimmerman v. Cook Cnty. Sheriff's Dep't*, 96 F.3d 1017, 1019 (7th Cir. 1996). Therefore, the Court considers whether Plaintiff properly notified the Sheriff about her accusations of co-worker harassment and, in the affirmative, whether the Sheriff acted reasonably to prevent the continuation of such harassment.

Plaintiff first contends that after she complained to supervisors and to the Sheriff himself, the Sheriff did not promptly act to correct the sexual harassment from her co-employees until October or November 2007, that is, more than a year after her first internal complaint and more than 3 months after the filing of her EEOC charge on July 13, 2007. The Court, however, finds there is a material dispute as to whether the Sheriff had sufficient notice of Plaintiff's allegations. Although Plaintiff alleges that she made

numerous complaints to her supervisors and that on March 11, 2007 she complained to the Sheriff himself, the Defendants deny that Plaintiff ever complained about sexual harassment or a hostile work environment to them. In addition, the Sheriff's failure to undertake an immediate investigation upon receipt of the EEOC charge on July 20, 2007, does not create liability because Plaintiff does not allege nor demonstrate injury based on delay. *See Hostetler,* 218 F.3d at 810 (finding that employer's failure to immediately investigate was not material to liability because plaintiff was not injured by the delay); *see also Knabe v. Boury Corp*., 114 F.3d 407, 412 (3rd Cir. 1997) (finding that even if investigation in the complaints is lacking, the employer cannot be held liable for the hostile work environment created by an employee under a negligence theory unless the remedial action taken subsequent to the investigation is also lacking). Under the present circumstances, the three or four month delay is immaterial because it is undisputed that the sexual harassment ceased some time around May 2007, and that Plaintiff stopped working on June 27, 2007. Because Plaintiff did not suffer any injury from the Sheriff's Office's tardy investigation, summary judgment is not warranted on this basis.

Plaintiff next argues that the Sheriff unreasonably failed to take remedial action because once evidence of sexual harassment surfaced the Sheriff suspended the investigation, refused to discipline the harassers and, instead, inquired into Plaintiff's

credibility.[8] Defendants respond that the suspension of the investigation was reasonable in light of the lack of evidence and credibility to support Plaintiff's allegations. As discussed above, material issues of fact exist that preclude summary judgment as to whether there was severe or pervasive sexual harassment at the ADF that would warrant prompt and effective remedial action on the part of the Sheriff.[9]

Viewing the evidence in the light most favorable to Sheriff Kaupas, several issues of material fact preclude summary judgment on Plaintiff's theory of negligence.

---

[8] The Court disregards as immaterial Plaintiff's allegations that the Sheriff's decision not to punish the harassers is further evidenced by the destruction of the "Book of Shame" and by Sgt. McGrath's promise, during the internal affairs investigation, not to discipline the interviewees. It is undisputed that Plaintiff never complained to any supervisor about the Book of Shame and Sgt. McGrath testified that he promised not to discipline anybody as part of an investigative strategy to invite the interviewees to speak out. Therefore, these allegations do not support Plaintiff's negligence theory.

[9] Plaintiff finally argues that the Sheriff's Office's anti-harassment policy and the channels for complaints of harassment at the ADF were ineffective because the Sheriff failed to respond to complaints of harassment of other female correctional officers. In support of this proposition, Plaintiff refers to six other female officers (Beverly, Tichy, Shiperak, Pacheco, Jesani, and Wolfe) who complained about sexual harassment at the ADF. This evidence, however, is inadmissible. First, Plaintiff's allegations that Arambasich identified two other potential victims, that Wolfe witnessed and experienced harassment, and that "it is likely that even more females were subjected to harassment" find no support in the record. Second, Beverly and Pacheco filed an unsuccessful sexual harassment lawsuit against the Sheriff's Office which discredits Plaintiff's reference to their complaints. Finally, Plaintiff cannot rely on Tichy and Shiperak's affidavits filed in connection with other lawsuits and complaining about a Lieutenant's sexual harassment. For alleged incidents of harassment to be relevant, the harassing conduct must be directed at employee to show hostile work environment. *See Mason v. S. Ill. Univ. at Carbondale,* 233 F.3d 1036, 1046 (7th Cir. 2000). Here, Tichy and Shiperak describe conduct that occurred in 2004, when Plaintiff was not yet hired at the ADF. Such instances of sexual harassment are therefore inadmissible to show negligence on the Sheriff's part.

# CONCLUSION

Based on the foregoing analysis, Plaintiff's motion for partial summary judgment against Sheriff Kaupas is denied. Defendants' motion for summary judgment on Plaintiff's sexual harassment claim is denied and Defendants' motion for summary judgment on Plaintiff's retaliation and IIED claims is granted. Defendants Sgt. Chester, Sgt Zaragoza, Adams, Alvarado, Harkins, Wilhelmi, and Sheriff's Office's motion for summary judgment on Plaintiff's Section 1983 claims is granted, and Defendants Sheriff Kaupas and Lt. Shifflet's motion for summary judgment on Plaintiff's Section 1983 claims is denied.

_____
Charles P. Kocoras
United States District Judge

Dated:  January 4, 2012